Karyn L. White, Esq.
Pacific Justice Institute
Pennsylvania/New Jersey Office
P.O. Box 276600
Sacramento, CA 95827
tel. (916) 857-6900
Bar #289922019
kwhite@pji.org
Attorney for Movant-Intervenor

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FREDERICK K. SHORT JR., TAMATHA COSTELLO | : | |
| | : | |
| Plaintiffs | : | Case No. 3:23-cv-21105 – RK-DEA |
| and | : | |
| | : | |
| EDITH MOLDANDO, | : | |
| | : | |
| Intervenor Plaintiff | : | |
| | : | |
| v. | : | Hon. Robert Kirsch, U.S.D.J., and |
| | : | Magistrate Judge Douglas E. Arpert |
| NEW JERSEY DEPARTMENT OF | : | |
| EDUCATION; ANGELICA ALLEN- | : | |
| MCMILLAN, Commissioner; CHERRY | : | **(PROPOSED)** |
| HILL SCHOOL DISTRICT, CRANFORD | : | **INTERVENOR VERIFIED** |
| SCHOOL DISTRICT, CRANFORD | : | **COMPLAINT AND JURY** |
| OF EDUCATION, | : | **DEMAND** |
| | : | |
| Defendants | : | |

Intervenor/Plaintiff EDITH MOLDANADO ("Intervenor/Plaintiff"), by her attorney, files this Complaint against the New Jersey Department of Education and Angelica Allen-McMillan, Commissioner of the New Jersey Department Of Education, acting in her official capacity, Cherry Hill Board Of Education, Cherry Hill School District, Cranford Public School District, and Cranford Board of Education and allege as follows:

1

## NATURE OF THE ACTION & REQUESTED RELIEF

1.      This is an action to set aside and declare as unconstitutional the New Jersey Transgender Student Guidance for School Districts (hereinafter, "Guidance"), established by the Commissioner of the New Jersey Department of Education (hereinafter, "NJ DOE"). A copy of the Guidance is attached as Exhibit A.

2.      The NJ DOE developed and issued Guidance that provides direction for school districts concerning transgender, transitioning, or gender-questioning students.

3.      The Guidance was adopted by countless school districts throughout New Jersey, including the Cherry Hill Township Public School District (hereinafter "CHTSD") and the Cranford Public School District (CPSD) as a Board of Education approved Policy #5756. See Exhibit E attached to Plaintiff Costello and Short's Complaint, a copy of the Cherry Hill Township BOE Policy #5756 (hereinafter "Policy").

4.      The Guidance and Policy, as developed and issued through final agency action of the NJ DOE and thereupon adopted in its entirety by the Cherry Hill Township Board of Education and Cranford Board of Education, is violative of Intervenor/Plaintiff's Fourteenth Amendment right to equal protection of the law and the First Amendment's rights to freedom of speech and freedom of religion.

## JURISDICTION AND VENUE

5.      This is an action for declaratory and injunctive relief. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 2201 (declaratory judgment), 42 U.S. Code § 1983 (civil action for deprivation of rights). This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claim because it

is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

6.      Final agency decisions are subject to judicial review. Intervenor/Plaintiff has met all applicable statute of limitations, namely, the six-year statute of limitations.

7.      Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this jurisdiction.

## PARTIES

8.      Intervenor/Plaintiff Edith Maldonado resides in Camden County, New Jersey with her husband and two children who attend the Cherry Hill Township Public School District.

9.      As indicated in the original complaint, and upon information and belief, Plaintiff Frederick K. Short Jr. resides in Camden County, NJ, with his wife and three children attending the Cherry Hill Township Public School District. These children are all in high school (freshman and juniors) at Cherry Hill High School West, within the Cherry Hill Township School District. The three children are minors and unemancipated under New Jersey law. Emancipation in NJ is generally defined as no longer within the sphere of influence of the parents, as evidenced by a child who no longer lives with or financially depends upon his/her parents. Plaintiff Short's three children are unemancipated.

10.     As indicated in the original complaint, and upon information and belief, Plaintiff Tamatha Costello resides in Cranford, New Jersey. She has a child who previously attended Cranford Public School from Kindergarten through 7th grade before leaving due to reasons described infra.

11.     Defendants are the New Jersey Department of Education, Angelica Allen-Mcmillan, Commissioner of the New Jersey Department Of Education, acting in her official capacity, Cherry Hill Board Of Education, and Cherry Hill School District.

3

## STATEMENT OF FACTS

12.     In 2017, the New Jersey Legislature passed, and Governor Chris Christie signed N.J.S.A. 18A:36-41, which directed the Commissioner of the NJ DOE to "establish guidelines to provide direction for schools in addressing common issues concerning the needs of transgender students and to assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students."

13.     The Guidance states in relevant part as follows:

- The intended purpose of this guidance is to help school and district administrators take steps to create an inclusive environment in which transgender and gender nonconforming students feel safe and supported, . . .

- Definitions:

   o **Gender Identity** means a person's internal, deeply held sense of gender. All people have a gender identity, not just transgender people. For transgender people, the individual's internal gender identity is not the same as the gender assigned at birth.

   o **Gender Expression** means external manifestations of gender, expressed through a person's name, pronouns, clothing, haircut, behavior, voice, and/or body characteristics. Society identifies these cues as masculine and feminine, although what is considered masculine or feminine changes over time and varies by culture.

   o **Assigned Sex at Birth (ASAB)** refers to the biological sex designation recorded on a person's birth certificate upon the initial issuance of that certificate, should such a record be provided at birth.

   **Gender Assigned at Birth** refers to the gender a child is assigned at birth or assumed to be, based on their biological sex assigned at birth.

   o **Sexual Orientation** describes a person's enduring physical, romantic, and/or emotional attraction to another person. Gender identity and sexual orientation are not the same. A transgender person may be straight, lesbian, gay, bisexual, or asexual. For example, a person who transitions from male to female and is attracted solely to men may identify as a straight woman.

   o **Transgender** is a term for an individual whose gender identity and/or gender expression differs from those typically associated with the sex and gender assigned at birth.

4

- o **Transition** is the process by which a transgender person recognizes that their authentic gender identity is not the same as the gender assigned at birth, and develops a more affirming gender expression that feels authentic. Some individuals socially transition, for example, through dress, use of names and/or pronouns. Some individuals may undergo a physical transition, which might include hormone treatments and surgery. School district personnel should avoid the phrase "sex change," as it is an inaccurate description of the transition process; the process is more accurately described as "gender-confirming."

- o **LGBTQ** is an acronym for "lesbian, gay, bisexual, transgender, and queer/questioning."

- o **Gender nonconforming** describes a person whose gender expression does not conform to the gender expectations of their family or community. Gender nonconformity is not necessarily an indication that a youth is transgender; many non-transgender youth do not conform to stereotypical expectations.

- o **Gender Expansive/Gender Diverse/Gender Fluid/Gender Non-Binary/Agender/Gender Queer** are terms that convey a wider, more flexible range of gender identity and/or expression than typically associated with the binary gender system. For example, students who identify as gender queer or gender fluid might not identify as boys or girls; for these students, the non-binary gender identity functions as the student's gender identity.

- o **Cisgender** refers to individuals whose gender identity, expression, or behavior conforms with those typically associated with their sex assigned at birth.

- It is recommended that school personnel discuss with the student the terminology and pronouns each student has chosen.

- A school district shall accept a student's asserted gender identity; parental consent is not required.   Further, a student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the district, school or school personnel.

- There may be instances where a parent or guardian of a minor student disagrees with the student regarding the name and pronoun to be used at school and in the student's education records. A parent or guardian may object to the minor student's name change request. School districts should consult their board attorney regarding the minor student's civil rights and protections under the NJLAD. Staff should continue to refer to the student in accordance with the student's chosen name and pronoun at school and may consider providing resource information regarding family counseling and support services outside of the school district.

- School districts shall ensure that a transgender student is addressed at school by the name and pronoun chosen by the student, regardless of whether a legal name change or change in official school records has occurred.

- School districts shall issue school documentation for a transgender student, such as student identification cards, in the name chosen by the student.

- A transgender student shall be allowed to dress in accordance with the student's gender identity.

- School districts shall honor and recognize a student's asserted gender identity, and shall not require any documentation or evidence in any form, including diagnosis, treatment, or legal name change.

- With respect to gender-segregated classes or athletic activities, including intramural and interscholastic athletics, all students must be allowed to participate in a manner consistent with their gender identity. School districts shall:

  o Provide transgender students with the same opportunities to participate in physical education as other students in accordance with their gender identity;

  o Permit a transgender student to participate in gender-segregated school activities in accordance with the student's gender identity.

- All students are entitled to have access to restrooms, locker rooms and changing facilities in accordance with their gender identity to allow for involvement in various school programs and activities. In all cases, the school principal must work with the student and staff so all parties are aware of facility policies and understand that the student may access the restroom, locker room, and changing facility that corresponds to the student's gender identity.

14.    The language from the Guidance was directly inserted into Policy #5756 and approved by the Cherry Hill Township Board of Education.

15.    The Guidance and Policy require affirmation and acceptance of the idea that a student's gender identity is fluid and can be determined by the student's feelings, emotions, or choices.  No medical diagnosis or treatment is required.

16.    The preamble to the New Jersey Constitution provides:

"We, the people of the State of New Jersey, grateful to Almighty God for the civil and religious liberty which He hath so long permitted us to enjoy, and looking to

6

Him for a blessing upon our endeavors to secure and transmit the same unimpaired to succeeding generations, do ordain and establish this Constitution."

See, *Am. Humanist Ass'n v. Matawan-Aberdeen Reg'l Sch. Dist.*, 440 N.J. Super. 582 (Law Div. 2015).

17.     Courts in our State have recognized that "[o]ver and over, from the writings of the founders of the Constitutions of both the United States and the State of New Jersey, emerges a faith in, and a reliance and even dependency upon God to help secure the blessings of liberties and freedom attendant upon good governance." *Id.*

18.     Government neutrality toward religion is the hallmark of the Religion Clauses. *Nichol v. Arin Intermediate Unit*, 268 F.Supp. 2d 536 (2003).   The Establishment Clause prevents a government from enacting laws that have the purpose of inhibiting religion.  *Id.*   As the Court wrote in *Student Members of Playcrafters v. Board of Education*, 177 N.J. Super. 66 (App. Div. 1981):

> We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma.  When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions.  For it then respects the religious nature of our people and accommodates the public service to their spiritual needs.  To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups.  That would be preferring those who believe in no religion over those who do believe.
>
> . . . We find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.

19.     The Guidance and Policy offend our country and courts' long-standing tradition and adherence to the principle of freedom of religion.

20.     Defendants may not establish a "religion of secularism" in the sense of affirmatively opposing or showing hostility to religion, thus "preferring those who believe in no religion over those who do believe." *Id.*

## FIRST CAUSE OF ACTION

## (THE GUIDANCE AND POLICY VIOLATE THE FOURTEENTH AMENDMENT OF THE NEW JERSEY AND UNITED STATES CONSTITUTIONS -EQUAL PROTECTION OF THE LAW)

21.     Intervenor/Plaintiff incorporates by reference all other allegations of this Complaint.

22.     The Equal Protection Clause of the Fourteenth Amendment provides "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

23.     Equal Protection subjects gender-based classifications to intermediate scrutiny. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); accord *Hassan v. City of New York*, 804 F.3d 277, 298-99 (3d Cir. 2015).

24.     It is well settled that laws that dispense "dissimilar treatment [to] men and women who are . . . similarly situated" violate the constitutional guarantee of equal protection. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975) (quoting *Reed v. Reed*, 404 U.S. 71, 77 (1971); see also, *Frontiero v. Richardson*, 411 U.S. 677, 688-91 (1973).

25.     Our Constitution requires a balance between Defendants' right to prevent discriminatory conduct and students' rights to freedom of religious belief.  The Guidance and Policy seek to achieve the first at the utter sacrifice of the second.  This is not necessary.  There are other appropriate means that Defendants can engage in, which would not demand that students abandon entirely their religious beliefs for Defendants to provide protection from discriminatory conduct.

26.     The "intermediate" level of scrutiny requires the distinction to be justified by an important

governmental interest that is substantially accomplished by the challenged discriminatory means. *United States v. Morrison*, 529 U.S. 598, 620 (2000).

27.     The burden of justifying the classification is on the Defendants who must show that the claimed justification is "exceedingly persuasive." *Id.*, citing *United States v. Virginia*, 518 U.S. 515, 533 (1996).

28.     The right to equal protection does not require Courts to scrutinize gender distinctions based on real physiological differences to the same extent it would scrutinize those distinctions when they are based on archaic, invidious stereotypes about men and women.  *State v. Chun*, 194 N.J. 54, 103 (2008).

29.     In advancing the interests of equal protection, a court cannot "demand that things that are different in fact be treated the same in law, nor that a state pretend that there are no physiological differences between men and women," when indeed there are differences.  *In re T.J.*, 212 N.J. 334 (2012).

30.     The Guidance and Policy fail to recognize the practical and real differences between male and female students when it not only allows but encourages an untrained school official to treat a student who is asserting symptoms of gender dysphoria but who has not received any medical diagnosis or treatment, to be treated exactly the same a student of the same biological status.

31.     Defendants should not be permitted to demand that because an individual asserts a gender identity without any diagnosis or medical treatment, two indisputably different things must be treated the same under the law.  There are differences between the sexes that can justify the disparity in law.  *Vorcheimer v. School Dist.*, 532 F.2d 880 (3rd Cir. 1976).

32.     Defendants cannot provide an "exceedingly pervasive" justification for the unequal treatment under the law of students and parents who hold religious beliefs contrary to the Guidance

and Policy's definition of "gender."

33.     Rather, Defendants can achieve its goal of preventing discriminatory conduct against ALL students by protecting those individuals with religious beliefs contrary to the Guidance and Policy's asserted definitions of gender.

34.     All New Jersey students deserve equal treatment under the law.  Defendants' actions herein do not provide that treatment.

35.     Thus, Defendants' Guidance and Policy have contravened the Intervenor/Plaintiff's Fourteenth Amendment right to equal protection under the law.

<u>**SECOND CAUSE OF ACTION**</u>

**(THE GUIDANCE AND POLICY VIOLATE THE FIRST AMENDMENT OF THE NEW JERSEY AND UNITED STATES CONSTITUTION<br>-RIGHT TO FREE SPEECH)**

36.     Intervenor/Plaintiff incorporates by reference all other allegations of this Complaint.

37.     New Jersey courts have acknowledged that while the U.S. Constitution provides "strong protections to our rights of free speech," the New Jersey Constitution "provides even broader protections than the familiar ones found in its federal counterpart." *Borough of Sayreville v. 35 Club, LLC*, 208 N.J. 491, 494 (2012). However, courts in New Jersey may rely on "federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution." *Hamilton Amusement Ctr. v. Verniero*, 156 N.J. 254, 264 (1998)

38.     It is axiomatic that "[t]he First Amendment, [which is] applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech. When enforcing this prohibition, [courts'] precedent[] distinguish between content-based and content-neutral regulations of speech." *Nat'l Inst. of Fam. v. Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

39.     As a general rule, laws that by their terms distinguish favored speech from disfavored

speech on the basis of the ideas or views expressed are content based . . . . By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral.  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994) (citations omitted).

40.     Content-based speech is subject to strict scrutiny—the most rigorous level of judicial review.  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015).

41.     Conversely, content-neutral speech is subject to what is characterized as intermediate scrutiny. *Turner Broad. Sys.*, 512 U.S. at 642 ("[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.").

42.     The Guidance and policy are content based because they "favor" certain speech on the "basis of view or ideas."

43.     The Guidance and Policy mandate that the "speech" between a student and an untrained school official be kept confidential from that child's parents.  Thus, the appropriate level of review of the Guidance and Policy is strict scrutiny.  *Id*.

44.     Strict scrutiny requires the Defendants to prove that the Guidance and Policy restricting speech "furthers a compelling interest and is narrowly tailored to achieve that interest."  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  Only a compelling state interest in the regulation of a subject within the state's constitutional power to regulate can justify limiting First Amendment freedoms.  *N.A.A.C.P. v. Button*, 371 U.S. 415 (1963).

45.     The Guidance and Policy do not identify any "compelling" interest that is "narrowly tailored."  Rather, Defendants broadly assert that the Guidance and Policy generally seek to "create an inclusive environment in which transgender and gender nonconforming students feel safe and

supported, and to ensure that each school provides equal educational opportunities for all students in compliance with N.J.A.C. 6A:7-1.1 *et seq.*"

46.     To be "narrowly tailored," the Guidance and Policy "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

47.     The Guidance and Policy heavily burden parents' and students' right to free speech by demanding that students and parents affirm Defendants' definition of gender and by demanding that schools support, facilitate and encourage children who are experiencing gender dysphoria without the notice, participation or support of the child's parents.

48.     Even assuming that Defendants' asserted justification for preventing discrimination is "compelling," there is no evidence that forcing all students and parents to affirm this type of "speech" is the only way to achieve such a goal.

49.     The Guidance and Policy have contravened Intervenor/Plaintiff's First Amendment right to free speech.

## THIRD CAUSE OF ACTION

### (THE GUIDANCE AND POLICY VIOLATE THE FIRST AMENDMENT OF THE NEW JERSEY AND UNITED STATES CONSTITUTION - FREEDOM OF RELIGION AND ESTABLISHMENT CLAUSE)

50.     Intervenor/Plaintiff incorporates by reference all other allegations of this Complaint.

51.     The First Amendment of the federal Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *U.S. Const. amend. I*.   Article I, Paragraph 4 of the New Jersey Constitution provides: "There can be no establishment of one religious sect in preference to another."

52.     Both documents encompass and protect two concepts: "freedom to believe and freedom to

act.  The first is absolute, but, in the nature of things, the second cannot be.  Conduct remains subject to regulation for the protection of society." *McKelvey v. Pierce*, 173 N.J. 26, 40 (2002) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940) {Emphasis added.}.

53.    The Free Exercise Clause contained in the First Amendment of the United States Constitution secures religious liberty in the individual by prohibiting any invasions thereof by civil authority. *School Dist. v. Schempp*, 374 U.S. 203, 223 (1963)).

54.    It protects both the freedom to believe, which is absolute, and the freedom to act, which is subject to regulation for the protection of society. *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940).

55.    An infringement of the Free Exercise Clause must be based on coercion.  *School Dist. v. Schempp*, 374 U. S. 203, 223 (1963).

56.    The establishment of religion clause of the First Amendment means at least this:  Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, **. . .**aid all religions, or prefer one religion over another.  Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance, or non-attendance.  The government's posture towards religion should be a benevolent neutrality.  *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 669 (1970).

57.    The Guidance and Policy violate the students' and parents' absolute right to "freedom to believe" in their sincerely held Christian beliefs based upon a Biblical worldview that contradicts such assertions.

58.    Christians have had long-standing religious beliefs based upon the Word of God, which

can be found in the Bible.  Christians believe God wonderfully and immutably creates each person as male or female. These two distinct, complementary genders together reflect the image and nature of God. (Gen 1:26-27.)  Rejection of one's biological sex is a rejection of the image of God within that person.  Christians believe that the term "marriage" has only one meaning: uniting one man and one woman in a single, exclusive union, as delineated in Scripture. (Gen 2:18-25.)  God intends sexual intimacy to occur only between a man and a woman who are married to each other. (1 Cor 6:18; 7:2-5; Heb 13:4.)  Any form of sexual immorality (including adultery, fornication, homosexual behavior, bisexual conduct, incest, and use of pornography) is sinful and offensive to God. (Matt 15:18-20; 1 Cor 6:9-10.)  But most importantly, Christians believe that God offers redemption and restoration to all who confess and forsake their sin, seeking His mercy and forgiveness through Jesus Christ. (Acts 3:19-21; Rom 10:9-10; 1 Cor 6:9-11.)  Every person must be afforded compassion, love, kindness, respect, and dignity. (Mark 12:28-31; Luke 6:31.)  Hateful and harassing behavior or attitudes directed toward any individual are to be repudiated and are not in accord with Scripture.

59.     The writings of the court in *Wis. v. Yoder*, 406 U.S. 205 (1972), written more than fifty years ago, are wholly applicable to what is happening today in public education regarding the treatment of Christians and their religious beliefs.  Substituting the word 'Christian' in place of the 'Amish,' see the writings of the *Yoder* court as follows:

> ". . .[T]he traditional way of life of [Christians] is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group and intimately related to daily living.  That [their] . . . religious practices stem from their faith is shown by the fact that it is in response to their literal interpretation of the Biblical injunction from the Epistle of Paul to the Romans, "be not conformed to this world . . . ."  This command is fundamental to the [Christian] faith.  Moreover, for [Christians], religion is not simply a matter of theocratic belief. . . . [the Christian] religion pervades

and determines virtually their entire way of life, . . .[The Christians'] religious beliefs and attitude toward life, family, and home have remained constant -- perhaps some would say static -- in a period of unparalleled progress in human knowledge generally and great changes in education. The [Christians] freely concede, and indeed assert as an article of faith, that their religious beliefs and what we would today call "life style" have not altered in fundamentals for centuries.  Their way of life in a church-oriented community . . . is . . . difficult to preserve against the pressure to conform. . . .As the society around the [Christian] has become more . . . complex, particularly in this century, government regulation of human affairs has correspondingly become more detailed and pervasive. The [Christian] mode of life has thus come into conflict increasingly with requirements of contemporary society exerting a hydraulic insistence on conformity to majoritarian standards. . . . [T]he values and programs of the modern secondary school are in sharp conflict with the fundamental mode of life mandated by the [Christian] religion; modern laws [the Guidance and Policy] have accordingly engendered great concern and conflict. The conclusion is inescapable that [public education], by exposing [Christian] children to worldly influences in terms of attitudes, goals, and values contrary to beliefs, and by substantially interfering with the religious development of the [Christian] child and his integration into the way of life of the [Chrisitan] faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the [Christian] faith, both as to the parent and the child.  . . . The impact of the [Guidance and Policy] on [Christians'] practice of [their] religion is not only severe, but inescapable, for the [Guidance and Policy] affirmatively compels them, . . . to [affirm beliefs] undeniably at odds with fundamental tenets of their religious beliefs.  See  Braunfeld v. Brown, 366 U.S. 599, 605 (1961). Nor is the impact of the [Guidance and Policy] confined to grave interference with important [Christian] religious tenets from a subjective point of view. It carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent.  [The Guidance and Policy] . .  for [Christian] children carries with it a very real threat of undermining the [Christian] community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region.

15

*Id.* at 216-218.

60.     Intervenor/Plaintiff recognizes that conduct remains subject to regulation for the protection of society. *McKelvey*, *supra,* 173 N.J. at 40. "The right of free exercise does not relieve an individual from the obligation to comply with a valid and neutral law of general applicability." *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990). Thus, in opposing the Guidance and Policy, Intervenor/Plaintiff is NOT asserting that students and parents have the right to engage in discriminatory conduct.

61.     All students of any religious belief OR claimed sexual/gender beliefs are constitutionally entitled to go to school free of discriminatory conduct.

62.     Intervenor/Plaintiff asserts that when public school students and parents are required as Christians who adhere to a Biblical worldview, *to affirm* that there are more than two sexes and/or that gender can be based on one's identity, the same violates their right to the free exercise of religion.

63.     The Guidance and Policy do not allow students or parents to opt out of the imposition of these beliefs. Such coercive and compulsory action on the part of Defendants denies the students' and parents' right to freely exercise their religion.

64.     The free exercise clause of the United States Constitution and its New Jersey counterpart, *N.J. Const. (1947), Art. I, par. 3*, extend to all lawful conduct founded in religious belief. *Thomas v. Review Bd., Ind. Empl. Sec. Div.*, 450 U.S. (1981); *Wisconsin v. Yoder*, 406 U.S. (1972); *Sherbert v. Verner*, 374 U.S. (1963).

65.     The guarantee of religious freedom protects against more than direct governmental proscription of religious practices. *Cantwell v. Connecticut*, 310 U.S. (1940).

66.     Even facially neutral legislation may be constitutionally offensive if, as applied to a

16

particular religious sect, ***it forces individuals to choose between abandoning their religious beliefs or sacrificing a governmental benefit***.  *Ibid.*

67.     In various contexts, the United States Supreme Court has stated that a "regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement" protecting the free practice of religious beliefs.  *Wisconsin v. Yoder*, *supra*, 406 U.S. at 220.

68.     It has also been stated that "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby ***putting substantial pressure on an adherent to*** modify his behavior and to ***violate his beliefs, a burden on religion exists***." *Thomas v. Review Bd., Ind. Empl. Sec. Div.*, *supra*, 450 U.S. at 717-718.

69.     "***The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs***," and, to that extent, ***the state may neither compel affirmation of repugnant religious practice nor penalize either directly or indirectly individuals or groups because of the religious views they harbor.*** *Sherbert v. Verner*, *supra*, 374 U.S. at 402. {Emphasis added.}

70.     The Guidance and Policy seek to "compel affirmation" of repugnant religious views.  Such action burdens Christian religious beliefs.  Students and parents should not be forced to leave their religious beliefs at the schoolhouse door to receive a free, appropriate public education from the State of New Jersey.  They should not have to sacrifice the "government benefit" or abandon their religious beliefs.

71.     Intervenor/Plaintiff acknowledges that "[n]ot all burdens on religion are unconstitutional." *United States v. Lee*, 455 U.S. 252, 257 (1982).  However, the State can only justify a limitation on religious liberty by showing that it is "essential to accomplish an overriding governmental

interest." *Ibid.* The State must show that there are "no less restrictive means of achieving" the important State interest.

72.     The stated goal of the Guidance and Policy can clearly be achieved without forcing students and parents to deny, abandon, alter, or reject their religious beliefs.

73.     All students are entitled to "an inclusive environment" and to "feel safe and supported" and to be provided "equal educational opportunities." However, such goals cannot be achieved by denying the fundamental religious liberties of some students.

74.     In *Everson v. Board of Education*, 330 U.S. 1, 67 (1947), Justice Black, in his opinion for the majority of the Court, explained the meaning of the Establishment Clause:

> The "establishment of religion" clause of the First Amendment means at least this:
> Neither a state nor the Federal Government can . . . pass laws which aid one religion,
> aid all religions, or prefer one religion over another. . . .[T]he State [must] be neutral
> in its relations with groups of religious believers and non-believers.
> Id. at 15.

75.     As the United States Supreme Court recently concluded in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), ". . .the First Amendment's protections extend to teachers and students, neither of whom shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Id. at 2423. See also, *Tinkdder v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969).

76.     Over forty years ago, the New Jersey Supreme Court addressed an issue similar to the one herein. In *Smith v. Ricci*, 89 N.J. 514 (1982), appellants challenged the State Board of Education's requirement that each local school district develop and implement a family life education program pursuant to N.J.A.C. 6:29-7.1. Appellants asserted, *inter alia*, that such a program constitutes an establishment of religion in violation of the Constitution. The *Ricci* court found no establishment of religion violation because there was "no compulsion" to participate in the program. The

program contained an "excusal clause," which stated:

> (i) The local board of education shall establish procedures whereby any pupil whose parent or guardian presents to the school principal a signed statement that any part of the instruction in family life education is in conflict with his/her conscience or sincerely held moral or religious beliefs, shall be excused from that portion of the course where such instruction is being given and no penalties as to credit or graduation shall result therefrom.   [_N.J.S.A. 18A:35-4.6 et seq._] [_N.J.A.C. 6:29.7.1(i)_]

77.     The excusal policy in *Ricci* stated that a pupil would receive instruction in all aspects of the family life education program unless a parent or guardian objects.  In such a case, the pupil will be excused, but only from those parts of the program that the parent finds morally, conscientiously, or religiously objectionable.  The *Ricci* court wrote:

> Where there is no compulsion to participate in this program, there can be no infringement upon appellants' rights freely to exercise their religion. See *Medeiros v. Kiyosaki*, 52 Haw. 436 (1970); *Citizens for Parental Rights v. San Mateo County Bd. of Ed.*, 51 Cal.App.3d 1(Ct. App.1975), appeal dismissed, 425 U.S. 908 (1976); *Hopkins v. Hamden Board of Education*, 29 Conn. Sup. 397 (Ct.Com.Pls.1970), appeal dismissed, 305 A.2d 536 (Conn.1973).

78.     In *Ricci*, the appellants argued that the regulation had a primary effect of inhibiting religion. The reason the court found this argument unpersuasive was that "[t]here [was] absolutely nothing in the regulation or in the curriculum guidelines that gives even the slightest indication that the program favors a "secular" view of its subject matter over a "religious" one.  The program is, as it must be, neither antagonistic toward religion nor supportive of non-religion."  *Id.*

79.     The *Ricci* court further wrote, "As long as the state does not unfairly represent any moral views that might undercut the teaching of a child's religion, sex is as unobjectionable a classroom subject as lyric passages from the Bible.  Further, such a course need not be "dehumanizing" or constitute a "religion of secularism."   Competing moral interpretations of sex may still be discussed, ***provided that one particular interpretation is not stressed to the exclusion of others***."  {Emphasis added.}  *Id.*  "The regulation is barren of any requirement that a point of view, be it

secular or religious, must be stressed to the exclusion of others." *Id.*

80.    The Guidance and Policy do not offer any "excusal" or opt-out for students whose religious values conflict with the assertion that there are more than two genders or that gender identity can be fluid or determined by how one feels.

81.    Defendants have mandated that all students and parents in public schools must affirm and agree with Defendants' definition of gender identity and gender classifications.  Such action "stresses one [moral interpretation] to the exclusion of others" and favors a "secular" view of the subject matter over a "religious" one.  The action is antagonistic toward religious views.  It unfairly represents moral views that undercut the teaching of a child's religion.  Defendants' actions made it very clear that there is only ONE view, which is the Defendants' view.  Any other belief is unacceptable.

82.    All other views on gender identity and gender classifications are prohibited, mocked, ridiculed, and accused of being prejudicial and bigoted.

83.    Defendants' actions are compulsory and coercive.

84.    Defendants are NOT neutral in their relations with religious believers.

85.    Defendants have become an adversary to anyone espousing religious beliefs that contradict their definition of gender.

86.    Defendants cannot constitutionally force a student or parent to profess a belief or disbelief in any religion.

87.    As our United States Supreme Court wrote in *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963):

> The wholesome "neutrality" of which this Court's cases speak thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that ***official support of the State or Federal***

***Government would be placed behind the tenets of one or of all orthodoxies***.

***This is what the Establishment Clause prohibits***.

88.    Defendants' actions are a "sure sign that our Establishment Clause jurisprudence [has] gone off the rails." *Kennedy*, *supra*, at 2431.  As the *Kennedy* Court wrote:

> . . .In the name of protecting religious liberty, the District would have us suppress it. Rather than respect the First Amendment's double protection for religious expression, it would have us ***preference secular activity***. . . . [It] undermine[s] a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been "part of learning how to live in a pluralistic society.". . . We are aware of no historically sound understanding of the Establishment Clause that begins to "mak[e] it necessary for ***government to be hostile to religion***" in this way. {Internal citations omitted.}

89.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

90.    Intervenor/Plaintiff's Fourteenth Amendment right to freely exercise her religion is contravened by the Guidance and Policy

**FOURTH CAUSE OF ACTION**

**THE GUIDANCE AND POLICY VIOLATE THE FIRST AMENDMENT OF THE NEW JERSEY AND UNITED STATES CONSTITUTION
-FAILURE TO ACCOMMODATE)**

91.    Intervenor/Plaintiff incorporates by reference all other allegations of this Complaint.

92.    It has been recognized that government accommodations of religious beliefs and practices may be consistent with establishment principles under the First Amendment. *Zorach v. Clauson*, 343 U.S. 306, 72  (1952) (allowing students leave time from public school for religious study is constitutional); *Nottelson v. Smith Steel Workers*, 643 F.2d 445, (7 Cir. 1981) (Title VII of 1964 Civil Rights Act, which requires reasonable accommodation of employees' religious beliefs unless

undue hardship would result, is constitutional); *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 (1977) (same by implication); L. Tribe, American Constitutional Law § 14-5 at 823 (1978) (anything which is "arguably compelled" by the free exercise of religion does not violate the prohibition against the establishment of religion).

93.     Courts have determined that accommodation of religious beliefs can be required under a state constitutional provision or the Free Exercise Clause and have found such constitutional mandates to be consonant with the Establishment Clause.  See *Rankins v. Commission of Prof. Comp. of Ducor*, 24 Cal.3d 167 (Sup. Ct.1979) (obliged under state constitutional prohibition of employment discrimination to allow employees unpaid leave for observance of religious holy days without fear of penalty); *Niederhuber v. Camden County Vocational & Technical School District*, 495 F.Supp. 273 (D.N.J.1980) (same under the Free Exercise Clause).

94.     The Guidance and Policy violates Intervenor/Plaintiff's right to religious freedom by failing to provide accommodations that protect religious freedom.

**STATE LAW CLAIM**

**FIFTH CAUSE OF ACTION**

**(THE GUIDANCE AND POLICY VIOLATE THE
NEW JERSEY LAW AGAINST DISCRIMINATION ("NJLAD")
N.J.S.A. 10:5-2.1)**

95.     Intervenor/Plaintiff incorporates by reference all other allegations of this Complaint.

96.     A little over thirty-five (35) years ago, the New Jersey Appellate Court first addressed the application of NJLAD in dealing with gender issues.  In *B.C. ex. rel. C.C. v. Bd. Of Edu.*, 220 N.J. Super. 214 ((App. Div. 1987) (which remains good law and has never been overturned or treated negatively in any subsequent case).

97.     The *B.C.* Court, citing *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir.

1982), *cert. denied*, 464 U.S. 818 (1983) concluded that recognizing the physiological difference between males and females is constitutionally permissible under both the State and Federal Constitution and is not violative of the New Jersey Law Against Discrimination or the statute prohibiting gender discrimination in education.

98.     In 2001, the New Jersey Appellate Division addressed the issue of transsexualism under NJLAD.   The Court concluded that NJLAD prohibited discrimination "for [individuals] transforming . . . from a man to a woman."   *Enriquez v. West Jersey Health Systems*, 342 N.J. Super. 501 (App. Div. 2001).  The *Enriquez* court wrote:

> Gender dysphoria is regarded medically as a "mental disorder occurring in an estimated frequency of 1:50,000 individuals." Cole, Emory, Huang, Meyer, *Treatment of Gender Dysphoria,* 90 *Tex. Med.* 68 (1994). Moreover, treatment for the disorder can now "be regarded as accepted medical practice." *Ibid. See also Farmer v. Brennan,* 511 U.S. 825, 829, 114 S. Ct. 1970, 1975, 128 L. Ed. 2d 811, 820 (1994) (transsexualism is a rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex ***and seeks medical treatment, including hormonal therapy and surgery to bring about permanent sex change***) (citations omitted).

> . . .With regard to gender dysphoria specifically, the manual notes that the "disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." *DSM-IV, supra,* § 302.85 at 537-38. Transsexualism can be accompanied by a profound sense of loathing for an individual's primary and secondary sexual characteristics, which is overwhelming and unalterable. *Dr. L. Gooren, An Appraisal of endocrine theories of homosexuality and gender dysphoria. In: Handbook of Sexology vol. 6,* 410-24 (Sitsen JMA, Amsterdam, Elsevier Science Publishers 1988). Thus, gender dysphoria is a ***recognized mental or psychological disability*** that can be ***demonstrated psychologically by accepted clinical diagnostic techniques*** and qualifies as a handicap under the LAD. N.J.S.A. 10:5-5(q).

> . . .***To constitute a handicap***, however, the disability must also result "from anatomical, psychological, physiological or neurological conditions which . . . is demonstrable . . . psychologically, ***by accepted clinical . . . diagnostic techniques***. ***N.J.S.A. 10:5-5(q)***.

99.     The *Enriquez* court concluded that ***in order to*** provide protections for "gender dysphoria" under the New Jersey Law Against Discrimination, ***the individual must "establish*** that she is

handicapped" by "prov[ing] that she had gender dysphoria" and that she had been "***diagnosed*** by 'accepted clinical or laboratory diagnostic techniques."

100.	Nearly twenty years later and most recently in 2023, the Court continues to recognize that gender dysphoria is a ***medical condition that can be diagnosed*** and is often accompanied by emotional problems.  See *Sacklow v. Betts*, 450 N.J. Super. 415 (Chanc. Div. 2017); *Betts v. Nichols*, 2023 N.J. Super. Unpub. LEXIS 902; and *Doe v. N.J. Dep't of Corr.*, 2020 N.J. Super. Unpub. LEXIS 1052.  Treatment plans include the physical transition from female to male or vice-versa.

101.	Neither the *Enriquez* court, *Sacklow* court, or *Doe* count found that simply because an individual chooses to assert that he or she is "transgendered" and wants to be called by a different name and dress differently without any accompanying "diagnosis" or medical treatment (or notification to his/her parents) by that individual, such minimal action is sufficient to trigger protections from discrimination under NJLAD.

102.	In violation of this precedent, the Guidance and Policy seek to require that school officials accept the wishes, feelings, and possibly fleeting thoughts of a student who asserts any symptoms of gender dysphoria and exclude parents from any discussions or conversations thereof.  This must occur without any clinical diagnosis or treatment or even notification to the student's parents.  A student's right to be "transgendered" is entitled to full protection under NJLAD without any medical diagnosis or treatment.  Such action and interpretation of the NJLAD contradict decades of law and precedent.

103.	As our State Supreme Court recently wrote in *State v. Olenowski*, 289 A.3d 456 (2023), "Courts are 'bound to adhere to settled precedent' under the principle of stare decisis. *Luchejko v. City of Hoboken*, 207 N.J. 191, 208 (2011).  The doctrine promotes 'a number of important ends,'

including 'consistency, stability, and predictability in the development of legal principles' as well as 'respect for judicial decisions,' *State v. Witt*, 223 N.J. 409, 439 (2015).

104.    In light of those compelling reasons, 'a special justification is required to depart from precedent.'" *Ibid.* (quoting *State v. Brown*, 190 N.J. 144, 157-58 (2008). . .  Special justification to overturn precedent might exist when the passage of time illuminates that a ruling was poorly reasoned, when changed circumstances have eliminated the original rationale for a rule, when a rule creates unworkable distinctions, or when a standard defies consistent application by lower courts." *Id.* at 467.

105.    Defendants have not offered any evidence that prior law on this issue was poorly reasoned or that it has created unworkable conditions.

106.    Requiring an individual to undergo a medical diagnosis and treatment for gender dysphoria provides a very "workable" justification for providing transgendered individuals protections under the NJLAD.

107.    The Guidance and Policy deny these actions are necessary and are contrary to "settled precedent."

108.    Allowing the Guidance and Policy to make sweeping changes contrary to established caselaw causes inconsistency, instability, and unpredictability in developing legal principles.

109.    The Guidance and Policy violate Intervenor/Plaintiff's rights under NJLAD and fail to offer any accommodation to Intervenor/Plaintiff whose religious beliefs are contrary to the Guidance and Policy.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Intervenor/Plaintiff respectfully requests this Court grant the following relief:

A.      An Order declaring:

(1)      The Guidance and Policy are unconstitutional and in violation of the Fourteenth and First Amendments of the United States Constitution, and unlawfully impinge upon Intervenor/Plaintiff's fundamental right to free speech and freely exercise her religion.

(2)      The Guidance and Policy violate NJLAD; and

(3)      The NJ DOE and school districts must set aside/strike the Guidance and Policy.

B.      Alternatively, if this Court finds that the Guidance and Order can remain, the State should be ordered to provide an opt-out from any teaching, discussion, event, influence, or other action that causes a parent or student to affirm or accept any definition of gender identity that conflicts with their sincerely held religious beliefs.

C.      Further alternatively, if this Court finds that the Guidance and Order can remain in place, and no Order shall be issued providing for an opt-out from any teaching, discussion, event, influence, or other action that causes a parent or student to affirm or accept any definition of gender identity that conflicts with their sincerely held religious beliefs, the State should be ordered to provide a free, appropriate public education through vouchers for students to attend private schools that do not require the parents and students to forgo their sincerely held religious beliefs to obtain a free and appropriate public education.

D.      An award of compensatory damages in excess of $75,000, the exact amount to be proven at trial.

E.      An award of attorney's fees and the expense of litigation.

F.      Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Intervenor/Plaintiff demands a trial by jury.

Dated: Jan. 24, 2024

Respectfully submitted,

/s/Karyn L. White

Karyn L. White, Esq.
Pacific Justice Institute
Pennsylvania/New Jersey Office
P.O. Box 276600
Sacramento, CA 95827
tel. (916) 857-6900
Bar #289922019
kwhite@pji.org
Attorney for Plaintiff/Intervenor

**VERIFICATION**

I, Edith Moldanado, have read the foregoing Verified Complaint and Jury Demand. Based upon my personal knowledge, I hereby certify that the statements set forth in this Complaint are true and accurate.

s/Edith Maldonado

Edith Maldonado